UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| TRINA GREGORY, | |
| Plaintiff, | |
| v. | Case No. 3:24-CV-544-CCB |
| BIMBO BAKERIES USA, INC., | |
| Defendant. | |

## OPINION AND ORDER

On July 3, 2024, Plaintiff Trina Gregory filed the initial complaint in this case. (ECF 1). In it, she alleged that her employer, Defendant Bimbo Bakeries USA, Inc., ("BBU") violated Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e *et seq.* ("Title VII"), and the Civil Rights Act of 1866, as amended, 42 U.S.C. § 1981. (*Id.*) She has since amended her complaint twice and dropped her Title VII claim. Her § 1981 claim is the only claim remaining. (ECF 18).

On February 17, 2026, BBU moved for summary judgment against Ms. Gregory. (ECF 47). Ms. Gregory has not responded. The Court grants BBU's motion for the following reasons.

### I.    RELEVANT BACKGROUND

As required by the local rules of this district, BBU filed a statement of material facts to accompany its motion for summary judgment. (ECF 48). Ms. Gregory did not respond to this statement of facts. Accordingly, the Court deems admitted those facts in BBU's statement that are supported by evidence in the record. *Keeton v. Morningstar,*

*Inc.*, 667 F.3d 877, 884 (7th Cir. 2012). The Court summarizes these supported facts below.

BBU is a commercial baking company. (ECF 48-1 at 9:12–18). Ms. Gregory began working at BBU's Elkhart, Indiana, facility as a Food Safety Environmentalist on November 1, 2010. (*Id.* at 9:13–15, 18:1–8). After five years, she changed roles, becoming a Bun Line Technician. (*Id.* at 18:19–23). In 2019, she became a Line Lead on the bun line. (*Id.* at 22:6–8). A Line Lead is responsible for ensuring the line runs correctly, filling in for any open positions, and acting as the supervisor's eyes and ears. (*Id.* at 22:12–23:15). Line Leads are expected to exhibit leadership qualities, including leading by example and abiding by BBU's policies and procedures. (ECF 48-7 ¶ 9). When Ms. Gregory became Line Lead, her direct superior was Resource Leader Chris Wade. (*Id.* at 11:18–19, 23:16–21). In or around 2020, Mr. Wade was replaced as Resource Leader by Gilberto Petrasevicius, a Hispanic man. (*Id.* at 25:4–10; ECF 48-7 ¶ 10).

Between 2021 and 2023, Ms. Gregory was involved in several altercations with other BBU employees. In or around June 2021, Ms. Gregory asked Mr. Petrasevicius to give her a white tub for buns. (ECF 48-1 at 33:9–25). He responded by yelling at Ms. Gregory, pointing his finger in her face, and telling her that he was her supervisor and she was going to have to learn some respect. (*Id.*) Ms. Gregory reported the incident to Human Resources Manager Sheila Houser but did not file a grievance. (*Id.* at 50:24–51:17). Ms. Houser told Ms. Gregory that Ms. Houser would speak with Mr. Petrasevicius about the incident. (*Id.* at 51:14–17).

In a separate incident, Mr. Petrasevicius also yelled at Ms. Dumas, a Black female BBU employee, making her cry. (*Id.* at 65:1–20, 67:11–14). Ms. Gregory and Ms. Dumas both reported the incident to Ms. Houser. (*Id.* at 68:25–70:13). Ms. Gregory did not tell Ms. Houser that she believed Mr. Petrasevicius was discriminating against Ms. Gregory and Mr. Dumas based on race. (*Id.* at 69:10–70:13).

In 2022, Ms. Gregory asked Adrianna Martinez, a "Caucasian/Mexican" coworker, to put her line gate down and stop feeding buns to other lines, as those other lines were getting overloaded. (*Id.* at 55:6–56:22). Ms. Martinez responded by hitting her hand with her fist in a threatening manner and telling Ms. Gregory, "[y]ou don't tell me how to do my job." (*Id.* at 55:10–57:14). When Ms. Gregory walked away, Ms. Martinez asked her, "[w]hy are you running?" (*Id.*) Ms. Gregory reported the incident to Mr. Wade, who told Ms. Gregory that he would take care of it. (*Id.* at 56:17–25). Ms. Martinez was terminated shortly thereafter. (*Id.* at 56:21–22, 57:1–5).

In 2022 or 2023, Chris Romphy, a white BBU employee, put his finger in Ms. Gregory's face and started cursing at her after she suggested he turn up the conveyor belt speed on his line. (*Id.* at 57:20–58:22). Debbie Dumas, another employee who witnessed the incident went and got Mr. Wade. (*Id.* at 59:14–17). Mr. Wade told Ms. Gregory that she needed to "handle the situation" next time. (*Id.* at 59:18–24).

In October 2022, BBU received a written complaint signed by more than thirty employees about the behavior of Ms. Gregory and two other employees. (ECF 48-7 ¶ 11). The employees complained that Ms. Gregory would mistreat them, yell, and humiliate them. (*Id.* ¶ 12). Ms. Gregory and the other two employees were suspended

3

pending an investigation of the complaint. (*Id.* ¶ 13). During the investigation, BBU interviewed dozens of individuals who signed the complaint and found that the allegations made in the complaint were substantiated. (*Id.* ¶ 14).

BBU's "Respect in the Workplace" policy provides that "[v]erbal, visual or physical conduct by any associate, applicant, customer, vendor, contractor or visitor that unreasonably interferes with an associate's work performance or creates an intimidating, offensive, abusive or hostile work environment will not be tolerated." (*Id.* at 10). The policy requires employees to promptly report any inappropriate conduct and details ways to report such conduct. (*Id.* at 11). As a result of the investigation, BBU concluded that Ms. Gregory had violated that policy. (*Id.* ¶ 15). It issued Ms. Gregory a final written warning, in effect for twelve months. (*Id.*) Any further violations of BBU policy while a final written warning remained in effect would be reviewed for disciplinary action up to and including termination. (*Id.* at 16). Mr. Petrasevicius was not involved in the decision to suspend Ms. Gregory, or to issue her a final written warning. (*Id.* ¶ 17).

On September 6, 2023, Ms. Gregory left her lines to help Bun Technician Bronson Wood with two lines that had gone down because the Line Lead for those lines, Narda Garcia, was at lunch. (ECF 48-1 at 82:20–83:3). Ms. Garcia returned to see Ms. Gregory "screaming" at Mr. Wood. (ECF 48-7 at 16). Mr. Wood reported the incident to Ms. Houser, informing Ms. Houser that Ms. Gregory had been talking down to him and kept stepping on Ms. Garcia's toes as Line Lead. (*Id.* at 15). Ms. Houser investigated the incident, considering statements from Mr. Wood, Ms. Garcia, and a witness. (*Id.* ¶ 19).

4

She concluded that Ms. Gregory had once again violated the "Respect in the Workplace" policy by yelling at other employees on the line and not respecting the Line Lead on shift. (*Id.* ¶ 20). Given Ms. Gregory's prior violation of that policy, BBU demoted Ms. Gregory from her Line Lead position on September 13, 2023. (*Id.* ¶ 21). Neither Mr. Wade nor Mr. Petrasevicius were involved in the decision to demote Ms. Gregory. (*Id.* ¶ 22).

Following Ms. Gregory's demotion, BBU provided her with a list of open positions to choose from. (*Id.* ¶ 23). She chose to work as a Receiver in the Sanitation Department. (*Id.*) In that role, Ms. Gregory reported to Food Safety Manager Paulina Zharare, a Black woman. (*Id.* ¶ 24). In November and December of 2023, Ms. Gregory had several disagreements with Ms. Zharare about her schedule and hours. (ECF 48-1 at 104:3–106:5). Ms. Gregory thought Ms. Zharare was excessively controlling. (*Id.* at 113:4–12). But while Ms. Gregory complained to human resources about Ms. Zharare, she never complained that Ms. Zharare was discriminating against her because of her race or any other protected characteristic. (ECF 48-7 at 25).

Ms. Gregory's Receiver position in the Sanitation Department was a temporary position that she filled due to another employee's FMLA leave. (*Id.* ¶ 26). A collective bargaining agreement ("the CBA") governs employment at BBU's Elkhart facility. (*Id.* ¶ 27). Pursuant to the CBA, employees are only allowed to bid for a position once per year. (*Id.* ¶ 28). But because Ms. Gregory's Receiver position was temporary, she was not required to bid for it. (*Id.* ¶ 29). A white BBU employee, Melissa Stanton, was also in a temporary Receiver position at the time. (*Id.* ¶ 30).

When the employee Ms. Gregory was filling in for did not return from leave, BBU was required by the CBA to put the position up for bid. (*Id.* ¶ 31). On February 5, 2024, two employees bid for the new permanent Receiver position: Ms. Gregory and Ms. Stanton. (*Id.* ¶ 32). The CBA mandated that the employee with seniority win the bid. (*Id.* ¶ 33). Ms. Stanton was senior to Ms. Gregory, so Ms. Stanton won the bid for the permanent Receiver position. (*Id.* ¶ 34). Ms. Gregory then bid for and transitioned to a Food Safety Environmentalist role. (*Id.* ¶ 36). She received the same pay in this new role as she did in her temporary Receiver role. (ECF 48-1 at 119:8–18). In May 2025, Ms. Gregory bid for and won a Bun Technician role after Food Safety Environmentalists were reduced at BBU. (*Id.* at 118:5–21). She won the bid for this role because she had seniority. (ECF 48-7 ¶ 39).

Ms. Gregory believes that she was demoted from her Line Lead role due to her race. (ECF 48-1 at 134:14–17). She believes that Mr. Petrasevicius did not like her. (*Id.* at 134:14–135:2).

## II.   LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

To determine whether a genuine dispute of material fact exists, the Court must review the record, construing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. *Heft v. Moore*, 351 F.3d 278, 282 (7th Cir. 2003). But the Court will not "sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe." *Waldridge v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994). Nor will the Court conduct research or develop arguments for the parties. *Nelson v. Napolitano*, 657 F.3d 586, 590 (7th Cir. 2011); *see also United States v. Beavers*, 756 F.3d 1044, 1059 (7th Cir. 2014) ("Perfunctory, undeveloped arguments without discussion or citation to pertinent legal authority are waived.").

To survive summary judgment, the nonmovant "cannot rest on the mere allegations or denials contained in his pleadings, but must present sufficient evidence to show the existence of each element of its case on which it will bear the burden at trial." *Robin v. Espo Eng'g Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000) (internal quotations omitted), *overruled on other grounds by Ortiz v. Werner Enters., Inc.*, 834 F.3d 760 (7th Cir. 2016). Summary judgment "is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Hammel v. Eau Galle Cheese Factory*, 407 F.3d 852, 859 (7th Cir. 2005) (quotations omitted); *see also Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010).

### III.    ANALYSIS

Ms. Gregory alleges that employment with BBU was contractual in nature and that BBU subjected her to harassment and adverse employment actions because of her

race or in retaliation for her complaints of racial discrimination. BBU seeks summary judgment on Ms. Gregory's racial harassment and discrimination claims, arguing that Ms. Gregory cannot establish a prima facie case of harassment and cannot provide direct or circumstantial evidence that she was demoted due to her race. It also seeks summary judgment on Ms. Gregory's retaliation claim because Ms. Gregory did not engage in protected activity.

### a. Racial Harassment

For a plaintiff to prevail on a claim of racial harassment, "(1) the work environment must have been both subjectively and objectively offensive; (2) race must have been the cause of the harassment; (3) the conduct must have been severe or pervasive; and (3) there must be a basis for employer liability." *Yancick v. Hanna Steel Corp.*, 653 F.3d 532, 544 (7th Cir. 2011). BBU argues that Ms. Gregory cannot show that race was the cause of the alleged harassment, the conduct was neither severe nor pervasive, and there is no basis for employer liability. The Court agrees with BBU on each front.

First, the undisputed facts do not show that the alleged harassment included conduct caused by race. Though racial harassment "need not be explicit, 'there must be *some* connection, for not every perceived unfairness in the workplace may be ascribed to discriminatory motivation merely because the complaining employee belongs to a racial minority." *Cole v. Bd. of Tr. of N. Ill. Univ.*, 838 F.3d 888, 896 (7th Cir. 2016) (quoting *Zayas v. Rockford Mem. Hosp.*, 740 F.3d 1154, 1159 (7th Cir. 2014). Here, it is undisputed that (1) Mr. Petrasevicius yelled at Ms. Gregory and pointed his finger in her face in

8

June 2021, (2) Ms. Martinez hit her hand with her fist in a threatening manner and told

Ms. Gregory that she could not tell Ms. Martinez how to do her job in 2022, (3) Mr.

Romphy cursed at Ms. Gregory in 2022 or 2023, and (4) Mr. Petrasevicius yelled at Ms.

Dumas in front of Ms. Gregory in 2022. None of these incidents involved racial

disparagement or conduct tied explicitly to race. Though Ms. Gregory believes she was

demoted due to race, that alone is not enough to create a genuine issue of material fact.

Plaintiffs are afforded all reasonable inferences at summary judgment, but that "does

not extend to drawing inferences that are supported by only speculation or conjecture."

*Harper v. C.R. England, Inc.*, 687 F.3d 297, 306 (7th Cir. 2012) (quoting *Argyropoulos v. City

of Alton*, 539 F.3d 724, 732 (7th Cir. 2008)); *see also Mlynczak v. Bodman*, 442 F.3d 1050,

1058 (7th Cir. 2006) (quoting *Mills v. First Fed. Sav. & Loan Ass'n of Belvidere*, 83 F.3d 833,

841–42 (7th Cir. 1996)) ("[I]f the subjective beliefs of plaintiffs in employment

discrimination cases could, by themselves, create genuine issues of material fact, then

virtually all defense motions for summary judgment in such cases would be doomed.").

As none of the facts besides Ms. Gregory's subjective belief support racial

discrimination, she cannot establish a genuine issue of material fact over whether race

caused the alleged harassment.

Second, the undisputed facts do not show that the conduct was severe or

pervasive.

> To be actionable, harassment must be sufficiently severe or pervasive to
> alter the conditions of employment and create an abusive working
> environment. Whether the harassment rises to this level turns on a
> constellation of factors that include the frequency of the discriminatory
> conduct; its severity; whether it is physically threatening or humiliating, or

>   a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.

*Ezell v. Potter*, 400 F.3d 1041, 1047 (7th Cir. 2005) (internal citations and quotation marks omitted). As noted above, Ms. Gregory testifies to four incidents of alleged harassment between 2021 and 2023: three incidents where different employees yelled at Ms. Gregory, and one incident where Ms. Gregory observed a supervisor yelling at another employee. BBU argues that these incidents are not enough to show that the harassment was severe or pervasive, and the Court agrees. *See Racicot v. Wal-Mart Stores, Inc.*, 414 F.3d 675, 677–78 (7th Cir. 2005) (finding "a limited number of incidents . . . more reflective of run of the mill uncouth behavior than an atmosphere permeated with discriminatory ridicule and insult" insufficient to establish severe or pervasive workplace harassment).

Finally, the undisputed facts do not establish a basis for employer liability. Two incidents involved conduct by Ms. Gregory's coworkers. "[W]hen a plaintiff claims that co-workers are responsible for the harassment, [s]he must show that [her] employer has been negligent either in discovering or remedying the harassment." *Cole*, 838 F.3d at 898 (internal citations and quotation marks omitted). The record does not support such a conclusion here.

Nor can Ms. Gregory show facts sufficient to establish supervisory liability. As Mr. Petrasevicius was not involved in the demotion decision or Ms. Gregory's lost bid, there is no evidence his alleged harassment resulted in a tangible employment action against Ms. Gregory. Citing this fact, BBU raises the affirmative defense that it

10

"exercised reasonable care to prevent and correct promptly [the] harassing behavior, and . . . the plaintiff employee unreasonably failed to take advantage of any preventative or corrective opportunities provided by the employer." *Burlington Indus. v. Ellerth*, 524 U.S. 742, 765 (1998). It is undisputed that BBU maintains a policy against harassment that requires employees to promptly report harassment, and it is undisputed that Ms. Gregory never reported any racially discriminatory harassment. Accordingly, the Court finds that this defense succeeds as a matter of law.

### b. Racial Discrimination

Ms. Gregory offers two factual bases for her race discrimination claim: first, that she was demoted from her Line Lead position due to her race, and second, that a white employee beat her out for the receiver position due to her race. Neither theory survives summary judgment.

A claim of unlawful discrimination may only succeed when "the evidence would permit a reasonable factfinder to conclude that the plaintiff's race . . . caused the discharge or other adverse employment." *Ortiz v. Werner Enter. Inc.*, 834 F.3d 760, 765 (7th Cir. 2016). Ms. Gregory's § 1981 claim requires her to show that her race was a "but for" cause of the adverse employment action. *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 341 (2020). To determine whether Ms. Gregory has made this showing, the Court must consider the evidence "as a whole, rather than asking whether any particular piece of evidence proves the case by itself." *Golla v. Off. of the Chief Judge*, 875 F.3d 404, 407 (7th Cir. 2017) (quoting *Ortiz*, 834 F.3d at 765).

11

One way to establish race discrimination is by satisfying the *McDonnell Douglas* "three-step burden-shifting framework." *Ames v. Ohio Dep't of Youth Svcs.*, 605 U.S. 303, 308 (2025). At the first step, the plaintiff must establish a prima facie case of discrimination by producing sufficient evidence to support an inference of discriminatory motive. *Id.* (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). If she is able to make out the prima facie case, the burden "shift[s] to the employer to articulate some legitimate, nondiscriminatory reason" for the adverse employment action." *Id.* If the employer is able to do so, then the burden shifts back to the plaintiff to show that the "stated justification was in fact pretext for discrimination." *Id.* (internal quotation marks omitted).

But this burden-shifting method is not the only way to prevail. The "ultimate question" at the core of the *McDonnell Douglas* framework is whether "the defendant intentionally discriminated against the plaintiff." *Id. McDonnell Douglas*, like all "tests and rubrics for viewing discrimination claims," is merely one approach to answering this ultimate question. *Li v. Fresenius Kabi USA, LLC*, 110 F.4th 988, 994 (7th Cir. 2024) (quoting *Ortiz*, 834 F.3d at 765). As a general matter, a plaintiff may prevail at summary judgment if he shows that the totality of the evidence "would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action." *Id.*

BBU argues first that Ms. Gregory cannot show that her demotion was discriminatory through the *McDonnell Douglas* framework because she was not meeting BBU's legitimate performance expectations and she cannot identify any similarly

12

situated individuals outside her protected class who were treated more favorably. It further argues that even if Ms. Gregory could make such a showing, BBU has identified evidence showing it had a legitimate, non-discriminatory reason for demoting Ms. Gregory.

A prima facie case of racial discrimination requires a plaintiff to show "(1) [s]he belongs to a protected class; (2) [s]he met [her] employer's legitimate expectations, (3) [s]he suffered an adverse employment action, and (4) another similarly situated employee outside of [her] protected class received better treatment from [her] employer." *Igsaki v. Ill. Dep't of Fin. and Prof'l Regulation*, 988 F.3d 948, 957 (7th Cir. 2021). Relying on the undisputed facts that Ms. Gregory had an obligation as Line Lead to promote cooperation and respect and that multiple employees complained about Ms. Gregory's demeaning and disrespectful behavior, BBU argues that Ms. Gregory failed to meet BBU's legitimate expectations. The Court agrees. BBU also argues that Ms. Gregory cannot identify any other Line Leads outside her protected class with similar disciplinary issues who were treated more favorably. Though the similarly-situated inquiry does not require "mechanical, one-to-one mapping between employees," *Coleman v. Donahoe*, 667 F.3d 835, 847 (7th Cir. 2012), courts generally require comparator employees to have "dealt with the same supervisor, [be] subject to the same workplace rules, and [have] engaged in similar conduct, but nonetheless received disparate treatment for no apparent legitimate reason." *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 940 (7th Cir. 2003). The record contains no evidence of such an appropriate

comparator. Accordingly, the Court finds that Ms. Gregory has failed as a matter of law to make out a prima facie case of discrimination.

Even if Ms. Gregory could establish a prima facie case of discrimination, the evidence supports BBU's argument that it demoted Ms. Gregory for a legitimate, nondiscriminatory reason. Ms. Gregory was demoted after repeated violations of BBU's "Respect in the Workplace" policy. The violation that led to her demotion occurred less than a year after she received a formal warning for her violations. And no evidence shows that the demotion was motivated by racial animus besides Ms. Gregory's subjective opinion. Nor is there any evidence outside the bounds of the prima facie case that would permit a reasonable factfinder to conclude that Ms. Gregory was demoted due to her race. Thus, the Court finds no genuine issue of material fact over whether Ms. Gregory's demotion was the product of racial discrimination.

Next, BBU argues that Ms. Gregory cannot show her loss of the bid for the Receiver position was racially discriminatory because the lost bid was not an adverse employment action. For Ms. Gregory to have suffered an adverse employment action, she must have suffered "some injury respecting her employment terms or conditions" that "left her worse off, but need not have left her significantly so." *Muldrow v. City of St. Louis, Missouri*, 601 U.S. 346, 359 (2024). Citing the undisputed fact that Ms. Gregory received the same pay rate before and after she lost the bid, BBU contends that her loss of the bid was not an adverse employment action. But this oversimplifies the facts. Ms. Gregory was in a temporary Receiver role before the bid, filling in for an employee on leave. When that employee failed to return, the position went up for bid. Ms. Gregory's

14

loss of the bid forced her to change roles, bidding for and winning a role as a Food Safety Environmentalist. It is not apparent from the evidence that this role transition did not leave her worse off, even if the pay rate was the same.

But ultimately this does not matter. The undisputed facts show that BBU had a legitimate, nondiscriminatory reason for denying Ms. Gregory's bid. The CBA provides that when multiple employees bid for a role, the employee with seniority wins. Ms. Stanton, the winner of the bid, had seniority over Ms. Gregory. As seniority was sufficient to ensure Ms. Stanton's success in the bid, and there is no record evidence of any illicit factors that influenced the bid, Ms. Gregory's argument fails.

Accordingly, the Court finds that Ms. Gregory cannot prevail on her racial discrimination claim as a matter of law.

### c. Retaliation

The key elements of a retaliation claim are (1) that a plaintiff engaged in protected activity, (2) that her employer took a materially adverse action against her, and (3) that there is a causal link between the protected activity and the adverse action. *Porter v. City of Chicago*, 700 F.3d 944, 957 (7th Cir. 2012). BBU contends that Ms. Gregory cannot show that she engaged in protected activity when she complained about harassment. And even if Ms. Gregory's complaints were protected activity, BBU maintains that there is no causal connection between her complaints and any further harassment or adverse employment action. BBU is right on both fronts.

For BBU to retaliate against Ms. Gregory because she complained of racial harassment and discrimination, Ms. Gregory would have needed to actually complain

15

to BBU that such racial harassment and discrimination was occurring. It is undisputed that she did not. While she complained about the conduct of other BBU employees, there is no evidence that those complaints raised any concerns of racial harassment or discrimination. BBU could not have retaliated against Ms. Gregory for complaints she did not make. *See Miller v. Am Fam. Mut. Ins. Co*, 203 F.3d 997, 1007–08 (7th Cir. 2000) ("An employee can honestly believe she is the object of discrimination, but if she never mentions it, a claim of retaliation is not implicated, for an employer cannot retaliate when it is unaware of any complaints."). And even if Ms. Gregory's harassment complaints were protected, no evidence suggests a causal link between those complaints and her demotion or lost bid, and Ms. Gregory fails to connect them. Thus, her retaliation claim fails as a matter of law.

## IV.   CONCLUSION

For these reasons, BBU's motion for summary judgment, (ECF 47), is **GRANTED**. As there are no remaining defendants, the Clerk is **DIRECTED** to close this case.

SO ORDERED on April 30, 2026.

/s/ *Cristal C. Brisco*

CRISTAL C. BRISCO, JUDGE
UNITED STATES DISTRICT COURT

16